# Reid *against* Stanley.

In ejectment, one who is neither party nor privy to the action, though an occupier of the ground in dispute for a time previous to the bringing of the ejectment, cannot be affected by the judgment that may be given in it, and is therefore a competent witness for the plaintiff.

Though a recovery for mesne profits cannot be had till possession is recovered, yet a possession gained by the owner's entry is sufficient without the necessity of an ejectment.

If one is applied to as agent to investigate the title of another to a lot which he has an interest in purchasing, and he undertakes the duty, he cannot use the information thus acquired to the injury of his principal. He is bound to disclose to him any material information obtained concerning the title, and if he conceals it and buys himself, it is a fraud; and he cannot hold the property without reimbursing to the principal any loss he may sustain by failing in the purchase.

ERROR to the District Court for the city and county of *Philadelphia,* in which ejectment was brought by Isaac E. Reid against Job Stanley, Charles Elsly and Catharine Barrett, to recover a

[Reid v. Stanley.]

lot of ground on the north side of German street between Third and Fourth streets, marked in a plan of division of Norton Pryor's estate, No. 39.   The facts in evidence were as follows:

On a division of the real estate of Norton Pryor, 11 lots, situate on the north side of German street, were allotted to Charles Pryor, who on the 7th June 1784 conveyed to Joseph Few lot No. 38, in breadth 21 feet and in depth 136 feet, bounded by lot No. 39, assigned to Charles Massey and wife.   On the 21st Dec. 1787, Few conveyed to John Morrison, who on the 30th June 1791 conveyed to Peter Morrison, calling it lot No. 23.   On the 13th March 1806 sheriff Barker sold and conveyed it as the property of Peter Morrison to John B. Dumontet.   On the 25th May 1813 Dumontet devised all that lot situate on German street, &c., to William Y. Birch and another, their heirs and assigns in trust to pay the income and proceeds to the separate use of his daughter during life and after her death over.

1. The defendants offered in evidence a deed dated October 8th 1828, from William Y. Birch, trustee to Hugh Buck, for lot on north side of German street between Delaware Third and Fourth streets, &c., marked in the plan of the division of the estate of John Pryor, deceased, No. 23, containing 21 feet by 136, bounded south by German street, east by lot No. 37, assigned to Thomas Pryor, north by Claypoole's ground, and west by lot No. 39, assigned to Charles Massey and wife.   Being the premises which, &c., (reciting the sheriff's sale and will), meaning the hereby granted lot, and reserving an annual ground-rent of $36.   The plaintiff objected to this deed on the ground that Birch, under the will, had no power to sell and could not consequently convey a title to Buck; but the court admitted it and sealed a bill of exception.

The plaintiff's title was as follows: A deed, Dec. 31st 1812, from Henry Pratt to Abraham Kintzing for (*inter alia*) a lot marked on the plan of division of the real estate of Norton Pryor deceased, No. 39, situate on the north side of German street between Third and Fourth streets, containing in front 21 feet and in depth 136 feet, bounded north by ground of Claypoole, west by lot No. 40, south by German street, and east by lot No. 38. Being the same lots which by deed of partition dated 12th Feb. 1812, were allotted to Henry Pratt, assignee of Thomas Massey, who was son of Charles Massey and wife, who was daughter of Norton Pryor.   Deed, Jan. 25th 1813, Abraham Kintzing to Henry Pratt for same lot.   Deed, May 27th 1836, Henry Pratt to Isaac E. Reid, the plaintiff, reserving a ground-rent of $52.50 per annum.

2. The defendants offered Hugh Buck, who stated on his *voire dire* that he had possession of the lot of ground he bought from Birch, till he sold it back to him, for six or seven years.   The

[Reid v. Stanley.]

plaintiff objected to his competency, but the court admitted him and sealed an exception.

He proved that the lots were vacant: no one in possession. He put several houses on the lot he supposed he had taken from Birch, (No. 39). Pratt claimed the other, (No. 38), and he rented it of Pratt on the 14th October 1833, at $20 a year.

3. The defendants then offered evidence of the value of the improvements and rents. The plaintiff objected, but the court admitted it and exception was taken. Buck then stated that the buildings he put up were worth $1300 or $1400. He refused to pay Pratt for the second year's rent till he showed his title. Pratt sued him and recovered. He had no acquaintance with Reid; but was advised by Heron to go to him and he would search the records.

4. The defendants then offered testimony as to a conversation between the witness and the plaintiff, relative to employing the plaintiff to search the records, which was objected to as irrelevant and illegal, but the court admitted it and the plaintiff excepted.

Buck then went on to state that he engaged Reid to search the records, who told him Pratt's title to the vacant lot was good enough and advised him to buy it. Witness declined buying of Pratt. When witness went to pay Pratt his rent, Pratt told him he had sold the lot to Reid and witness was to give possession to Reid. Witness took Reid along to give him possession, but Reid went part of the way, left him and never came to get possession of him. Nothing was said about buying the buildings. Pratt claimed the vacant lot as his. On the 30th May 1836, Pratt gave witness written notice to quit his lot on the 30th June 1836, stating the premises were let to Reid, and directing him to give immediate possession to him. Witness further said, that when he sold back to Birch, he did not know the buildings were on the wrong lot, and that there was a flaw in Birch's deed to him.

5. The defendants offered R. Smethurst to prove conversations between Reid and Pratt respecting the sale of the lot. Objection was made by the plaintiff, but overruled and exception taken. He proved that the plaintiff applied to Pratt for and obtained a vacant lot on German street, and that nothing was said about buildings on it. It was said to be the lot in Buck's possession. Pratt had no other lot on the north side of German street between Third and Fourth streets. He was not familiar with its location.

John Heron then testified that he recollected directing Buck to Reid. The next time he saw Reid, Reid told him he had searched the records for Buck and found Buck's houses were on the wrong lot. That passed over for a few days and Buck was about selling his property to Birch. When Buck was selling or had sold it, Reid asked witness if Buck had received his money for it; he told him he had not but expected he would in a few days. Reid then said he wished Buck had his money, for the buildings were on the

[Reid v. Stanley.]

wrong lot; that if Buck once got his money, he would take the lot on ground-rent and get the houses, and asked witness if he would do it. Witness replied it was rather too dirty a job to have anything to do with, but said if Reid did it, he (witness) ought to have part of the profits. Reid did not consent to this. Witness afterwards saw him but he said nothing more. Reid told him in the conversation he had with him, that he would not have taken the lot, if he had not known there were buildings on it.

6. A sixth bill of exception was taken by the plaintiff to evidence of the amount of rents of the property with the buildings on it.

The defendants requested the court to charge upon the following points:

1. That upon the evidence in this case the jury have a right to presume an exchange to have taken place between Pratt and Dumontet or Birch; and that such exchange, though by parol, if followed by possession and improvements, would be valid.

2. That if there was no exchange, yet if Pratt stood by and saw the buildings put upon the lot 39 without giving notice, he could not recover in ejectment without paying for the improvements.

3. That if there was a mutual mistake of fact as to the position of their respective lots, Pratt could not recover without paying for the improvements.

4. That by his claim of lot No. 38 as his own, suing for rent, claiming damages, &c., Pratt was equitably estopped from claiming No. 39; at least without paying for the improvements, if they were put in *bonâ fide*.

5. That Reid, upon the evidence, is not to be considered as a *bonâ fide* purchaser without notice, but is affected by all the equities with which Pratt was affected; and therefore, if entitled to recover, must pay for the improvements.

6. That if the jury believe that Reid was applied to by Buck to examine into the state of the title for him, and undertook the office, Reid stood in the situation of attorney or confidential agent for Buck; and as such was disabled by the rules of law from becoming the purchaser of the property for himself; and that his purchase was void as against Buck and all claiming under him.

7. That the conduct of Reid, in purchasing for himself the lot 39 from Pratt, without communicating to him the fact of the buildings being upon the lot, was a fraud which vitiated the transaction and prevented his obtaining specific performance in this equitable action.

8. That even if Reid was not the attorney or confidential agent of Buck, yet under the circumstances of the case, his purchase was fraudulent and such as to prevent his recovering in this action.

[Reid v. Stanley.]

The judge charged *inter alia* as follows:

I will now notice defendant's 6th point. The general rule is, that where a person is actually or constructively an agent for other persons, all profits and advantages made by him in the business beyond his ordinary compensation, are to be for the benefit of his employers; *Story on Agen.* 203. In *Galbraith* v. *Elder*, (8 *Watts* 94), the doctrine was applied to the case of counsel and client, and was said to extend to other species of trust. I state the law to be, that if Reid was applied to as an agent by Buck to investigate the title to lot No. 38, and accepted the office, and assumed the duty of making such investigation for Buck, he cannot legitimately use the information thus obtained to the injury of Buck. If the title to No. 39 was found by him to be complicated with that of No. 38, he could not become a purchaser of either to the prejudice of Buck. The facts are for the decision of the jury. It is to be observed that at the date of Pratt's deed to Reid, Buck had not re-conveyed to Birch. Reid's position in regard to those now claiming to hold under Buck is no better than it was in regard to Buck himself. In substance, therefore, I charge that the defendant's 6th point is true.

Errors assigned:

I. The court erred in admitting Buck as a witness.

II. In admitting evidence:

1. Of the deed from Birch to Buck.
2. Of the value of the improvements and of the rents.
3. Of a conversation between the witness and plaintiff relative to the former employing the latter to search the records, &c.
4. Of conversations between plaintiff and Pratt respecting the sale of the lot by the latter to the former.
5. Of the rents of the property with the houses on.

III. In charging in the manner mentioned in the charge.

This case was argued at March term 1843 by *Norris*, for the plaintiff in error, and *R. Patterson* and *T. I. Wharton*, for the defendant in error, and was twice re-argued at this term by *Norris*, for the plaintiff in error, and *T. I. Wharton*, contra.

The opinion of the Court was delivered by

Kennedy, J. — The first error assigned is an exception to the admission of Hugh Buck as a witness on behalf of the defendants below. It is alleged that he was interested in the event of this suit, and liable to the plaintiff in case of his recovery, for the mesne profits of the property in dispute from the 1st day of June, at least, if not from the 27th day of May preceding, 1836, to the 4th day of the same June, when he parted with the possession of the lot in question to William Y. Birch. This action was commenced on the 12th October 1837, and tried on the 2d January 1842. The

[Reid v. Stanley.]

plaintiff claimed under a deed of conveyance from Henry Pratt, dated 27th May 1836, but never made any demand of the lot from Buck, who held the possession of it at the time as the tenant of Henry Pratt, the plaintiff's grantor, to whom he paid the rent agreed on for it up to the 1st day of June 1836. And indeed it appears, according to the understanding between Pratt and the plaintiff, that Buck was not to give the possession of the lot to the plaintiff until the 30th June 1836. This appeared, on the trial, from a written notice to that effect signed by Henry Pratt and addressed to Hugh Buck, the witness, requiring him to leave and deliver up the possession to Isaac E. Reid, the plaintiff, to whom, as Pratt mentions, he had let the same. Under these circumstances, it would seem to be doubtful whether the plaintiff could at any time have held the witness accountable to him for the rents or mesne profits of the lot in question; and more especially as it was not the lot to which Pratt thought, at the time, he had a title, and believed he was conveying to the plaintiff. The lot to which Pratt thought he had a right, was No. 38, which he, as well as Buck, had mistaken the location of lot No. 39. They had transposed the location of the two lots, Nos. 38 and 39, so that the lot actually numbered 39, the one now in question, was in reality Pratt's lot, but was considered and believed to be the lot that was numbered 38, which had been devised by John B. Dumontet to William Y. Birch, who sold and conveyed the same to the witness, Hugh Buck, who, under the mistake mentioned, very innocently put buildings and improvements on lot No. 39, instead of lot No. 38, to the value of $1400. Reid, the plaintiff, however, who was employed by Buck to examine into Buck's title to the lot which he was improving as his own, discovered the mistake, but concealed it from Buck until he (Reid) became the purchaser himself of lot No. 39, from Pratt, and until Buck had sold and conveyed the lot back, as he supposed, with the improvements made on it, by him, to William Y. Birch. The plaintiff, knowing that Buck, through mistake, had made all his improvements upon lot No. 39, instead of lot No. 38, bought No. 39 of Pratt, the latter believing, at the time, that it was without any building or improvement upon it other than a fence of some sort which had been put around No. 38 by Buck, supposing it to be No. 39. The plaintiff, having thus purchased the lot No. 39 of Pratt, with valuable improvements made upon it by Buck, as an unimproved lot, and for a consideration which was deemed equal only to its value in that state, might well feel somewhat diffident about calling on Buck to demand the possession of it from him. And, indeed, it seems, he never did. Buck, however, in the course of a few days after the plaintiff purchased of Pratt, sold and delivered the possession of the lot to William Y. Birch, against whose assignees or their tenants this action is brought. But as to lot No. 38, which Buck, as also Pratt, supposed was Pratt's lot, Buck never did anything with it after the

[Reid v. Stanley.]

plaintiff purchased of Pratt. It does not appear that he used or occupied it in any way. And it is abundantly clear that his occupation of lot No. 39, which is the lot claimed by the plaintiff, was under a mistake, into which Mr Pratt, the owner thereof, as well as himself, fell, and that he would have been greatly the loser had he not sold back to William Y. Birch. And it is equally clear, that if the plaintiff were to recover the lot in question, with all the improvements put on it by Buck, he would gain what he never paid for, and what the owner of the lot never intended to sell, or supposed that he was selling when he sold to him. Under such circumstances, the claim of the plaintiff for mesne profits, against Buck, in any event of the suit, would not seem to have much, if any equity in it. But, in point of law, how can Buck be considered so interested in the result of this suit as to render him an incompetent witness for the defendant, on the score of interest? It appears to me, that he can neither gain nor lose by the direct legal operation and effect of the judgment in this case, nor that the record can be legal evidence for or against him in any other action; and this would seem to be the general rule laid down for testing the competency or incompetency of a witness on the ground of interest. *Bull. N. P.* 284; *Bent* v. *Baker*, (3 *T. R.* 27); per TINDAL, C. J. in *Doe* v. *Tyler*, (6 *Bing.* 394); *Rex* v. *Boston*, (4 *East* 581), per Lord ELLENBOROUGH; *Greenl. Ev.*, *pl.* 390. A recovery in ejectment, in general, like judgments in other cases, only binds parties and privies. *Chirac* v. *Reinicker*, (11 *Wheat.* 280). Hence the judgment is not evidence against a previous occupier. *Bull. N. P.* 87. Therefore Buck, being neither party nor privy to this action, though a previous occupier of the lot in question, could not be affected by the judgment that might be given in it. Even in an action brought against a landlord for mesne profits after a judgment by default against the casual ejector, such judgment cannot be given in evidence against him without proof that he received due notice of the service of the ejectment upon the tenant in possession. *Hunter* v. *Britts*, (3 *Camp.* 455).

It has, however, been objected, that a recovery in this action was essentially necessary, in order to enable the plaintiff to maintain an action against Buck, the witness, for mesne profits; that such action could not be maintained by the plaintiff until he gained possession of the lot, and that such possession as would enable him to maintain the action, could only be acquired by means of a recovery thereof in ejectment. It may be conceded that such action cannot be maintained by the plaintiff against Buck until he shall have gotten possession of the lot; but then it is a mistake to say that it must necessarily be acquired by means of a recovery in ejectment; for if the plaintiff can show that he has the freehold, and is entitled to the possession, he may enter upon the lot without legal process of any description whatever; and having thus acquired possession, may maintain the action in the same manner

and to the same extent that he could have done had he been put
into the possession by reason of a recovery in ejectment.   Judge
BLACKSTONE says: " before entry and actual possession one can-
not maintain an action of trespass, though he hath the freehold in
law.   And therefore an heir, before entry, cannot have this action
against an abator; though a disseisee might have it against the
disseisor for the injury done by the disseisin itself, at which time
the plaintiff was seised of the land; but he cannot have it for any
act done after the disseisin, until he hath gained possession *by re-
entry*, and then he may well maintain it for the *intermediate da-
mage* done; for after his *re-entry*, the law, by a kind of *jus post-
liminii*, supposes the freehold to have all along continued in him."
3 *Bl. Com.* 210; 11 *Co.* 5; 4 *Kent's Com.* 119; *Co. Litt.* 257 *a*,
275 *b*; 1 *Co.* 98; 1 *Leo.* 302; *Tobey* v. *Webster*, (3 *Johns.* 468);
13 *East* 489; *Willes* 329; 2 *Stran.* 1086; *Note* (*e*) *Thomas's Coke*
58 (72).   If the authorities just cited are not sufficient to show
that the plaintiff in this action after making such entry and upon
showing his right to the freehold and possession in the lot, could
maintain his action against Buck for the mesne profits during the
few days that he may have occupied the lot after the plaintiff ac-
quired his right, I apprehend, that a recovery in ejectment would
not enable him to do so.   We, therefore, think that Buck was a
competent witness for the defendants under any view that can be
taken of the question.

In regard to the exceptions taken to the admission of evidence, it
is difficult, if not impossible, to conceive even any plausible grounds
for taking them.   All the evidence admitted by the court in oppo-
sition to the objections of the plaintiff's counsel tended to prove
and establish the facts upon which the defendants relied for their
defence against the plaintiff's claim.   First, for instance, to show
that those under whom the defendants claimed had originally a
good title to lot No. 38; secondly, to show that a mutual mistake
had arisen between them and the former owner of the lot No. 39,
by which the position or location of these lots became transposed
in the opinions of their respective owners; thirdly, that valuable
improvements had been made by the owner of lot No. 38, under
this mistake, upon lot No. 39; and fourthly, that the plaintiff, as
the agent of the then owner of lot No. 38, who under the mistake
mentioned had made the improvements on lot No. 39, had practised
a fraud upon him whereby he was prevented from reimbursing
himself the cost of the improvements made on lot No. 38 by buying
No. 39 from its then owner, Henry Pratt, on the same terms that
the plaintiff did.   We are therefore decidedly of the opinion that
the evidence objected to was all properly admitted.

The only remaining error is an exception to the answer given
by the court to the sixth point submitted by the defendants' coun-
sel.   By this point the court was requested to charge the jury that
" if they believed from the evidence that the plaintiff, Reid, was

applied to by Buck to examine into the state of the title for him, and undertook the office, he (Reid) stood in the situation of attorney or confidential agent for Buck; and as such was disabled by the rules of law from becoming the purchaser of the property for himself; and that his purchase was void as against Buck and all claiming under him." To which the court answered: "If Reid was applied to as an agent by Buck to investigate the title to lot No. 38, and accepted the office and assumed the duty of making such investigation for Buck, he could not legitimately use the information acquired in so doing, to the injury of Buck. If the title to No. 39 was found by him to be complicated with that of No. 38, he could not become a purchaser of either to the prejudice of Buck." In this answer of the court we can perceive no error. If the mistake in regard to the location of the lots Nos. 38 and 39 was discovered by Reid in the discharge of his duty to Buck as his agent, it was clearly his duty to have advised Buck immediately of it, as it was a matter of the first importance to the interest of the latter that he should be so advised. It might have enabled him to have had the mistake corrected with Mr Pratt in such a way that he could not have been the loser by it, or he might have purchased of Mr Pratt on the like terms that the plaintiff did, and thus have saved himself from loss. But the plaintiff, instead of informing Buck of the mistake, concealed it from him, and, as it would appear from the finding of the jury, without delay became the purchaser of lot No. 39 himself, as an unimproved lot, for an unimproved price; and now wishes to obtain it, with all the improvements put upon it by Buck, from those to whom Buck sold for a valuable consideration. No one can doubt that it would be a fraud of the grossest kind to permit him to do so, without reimbursing them the money or price paid for the improvements. This, however, he has never offered to do. Neither do we wish to be understood as giving an opinion that he would be entitled to recover the lot by doing so, unless the defendants, upon being informed by him of the amount of the monies paid by him for and on account of it, should refuse to reimburse him. This they are bound in equity to do, if they wish to hold the lot under his purchase of it. If he had brought this action after making known the amount paid by him on account of the lot, and payment thereof had been refused by the defendants, he doubtless would have been entitled to recover in it; or if on the trial he had made known the amount and given satisfactory evidence of its having been paid by him, I do not see but the jury might have given a verdict in his favour, to be released upon the defendants' paying the same with the costs of suit within a reasonable time to be mentioned by them in their verdict; or if the defendants had thereupon offered to pay the amount without time, that the plaintiff would have been bound to have taken it without costs, as he had never made it known before or offered

to accept of it. But in regard to this matter of costs, it is unnecessary to give any definite opinion of the court, as no question of the kind was raised on the trial of the cause.

Judgment affirmed.